Yes, your honor. May it please the court, my name is J.D. Maris. I'm representing Israel Salinas in this matter. What we're doing is contesting the district court's denial of a motion to suppress that we brought in an action. This case turns somewhat on the definition of curtilage. Our arguments are basically that the police officers in this matter, without a warrant, entered the curtilage of a home. Did you say without a warrant? You said without a warrant? Yes, your honor. I thought they had a warrant. They did not, your honor. Wasn't there a warrant for the arrest of Salinas? There was an arrest warrant. There was not a search warrant. Doesn't an arrest warrant authorize entry? It does not, your honor. It doesn't? No, sir. You can't walk up the sidewalk to the house? You can walk up the sidewalk to the house, your honor. If you have a warrant, you can't go in a house to arrest somebody? Only if you know that it is his home. Know or have probable cause that he's there. Only if you know that it's his home. So your position is that if an officer has probable cause that a person named in an arrest warrant is present in a house, that's not sufficient grounds to enter the house? It is not, your honor. It would be sufficient grounds perhaps to gain a search warrant for that house. You have probable cause to think that in effect contraband, in this case someone with a warrant, was inside the house. And then at that point you could get a search warrant to enter the house. But the fact that a person has a warrant for his arrest and he may be in a house, not necessarily his residence, some of the cases may turn on whether it's his residence or not. And in this case, the police officers gave no indication anywhere in this matter that this was his residence. However, it was his residence, and hence we have standing to raise the issue of curtilage in this matter. And that's our position because he was living in that house. The police officers did not know it, however. Indeed, the police officers received information that Salinas was perhaps in the house as well as two other people, all three of which had arrest warrants for them. The officer that received that information gathered a number of officers together from a number of different jurisdictions, including the county sheriff, the city's people, some probation and parole people, and indeed a bail bondsman showed up also at the same time. And these people together, after they had formulated their approach to this information, decided they were going to go to this home. It was a duplex. And as part of their plan, they surrounded the home and two officers approached the front door. Now, they did not have a warrant, so they chose to use what's known in the police lingo as a knock and talk. In other words, they were going to knock on the door, and a knock and talk then is an attempt to either gain entry through consent into the house or look inside the house. There's a number of cases that with knock and talk you look inside and there's contraband inside the house, and at that point then the police enter the house. And that was not the case this, however. There was an extended conversation at the front door, and finally the young lady allowed the officers to enter the house. Our contention, aside from the curtilage issue, was under the circumstances, late at night, with officers that were decked out in essentially in SWAT team clothes, anyway, dark clothes, with their badges, however they were identified. Okay. Under the curtilage issue, assuming that's curtilage and they entered the curtilage, was anything discovered in the curtilage that's used against the defendants? There is no indication that there was any information gained by the officers that what we allege while they were in the curtilage that led to. And what's the relevance of this curtilage argument? Well, Your Honor, the relevance would be is they were in the curtilage. It would be our argument is as if the police. Suppose they were in your house at the same time. Well, what difference does it make to this case? Well, what it means in this case would be is if you were at the front door or you were in your home in the front door and there were police officers in the back, in your backyard. Okay. The real issue of curtilage is what area of expectation of privacy does someone have? And if they're in it. I'm assuming in your favor that that is the curtilage and that they were in the curtilage. But if they didn't discover any evidence in the curtilage to use against the defendant, what difference does it make? Well, this is the issue, Your Honor. It was an illegal search. They were in an area. They were not authorized to be. And they were in there as they were attempting to gain consent. It would be the same thing as if they were in a home already, inside it, inside the walls. That would suggest that we could suppress any – that we ought to suppress any evidence that was discovered in the course of violating the curtilage  But there was no evidence discovered in the curtilage. All they were doing was walking across the property trying to arrest this guy. The issue being, Your Honor, that there's one search here. Not a search of just the curtilage. There's a search of the house, an entry into the house. And it was an illegal entry. As they entered, they had already violated the Fourth Amendment. They were violating as they entered the house. It has some issue to do later when we're talking about whether this consent, whether it was voluntary or not. And, indeed, assuming – my last argument was assuming that it was a voluntary consent. Too bad. The officers had already violated the Fourth Amendment and were violating it as they were asking for consent. And, indeed, I use the words, what they were really doing was begging for forgiveness as opposed to asking for permission at that point. The issue before us on the curtilage issue, if I might return to that, would be as to whether the district court judge properly determined whether this duplex had curtilage at all. Indeed, from the pictures and that sort of thing that were presented to them and the arguments that the government made underdone, per se, there was no curtilage at that house. But, indeed, there was. Indeed, if I could refer you to the pictures of the home that were provided by the government after we determined we couldn't find it, and find them, you can see from the pictures of the back, I believe it was – would be in the attachment number five on the supplemental to the record that the government made. I mean, here's a picture of a location of where one of the officers stood, which was an attached storage garage to the duplex, looking at a waiting pool of a child. I mean, if curtilage is an area where people have expectations of privacy or to do the intimate things associated with their lives, I would say that this little patio in that picture most certainly is an area. And, by the way, it was at night and in the dark. The officers were standing there. So we say our argument was we were in the curtilage. Mr. Maris, let's suppose that we were to go beyond your curtilage argument. Can you tell me why the – why her consent was not good to allow them into the – the officers into the home? Well, first and foremost, my argument was under the circumstances where they stood at the front door and essentially pointed out the law to her for five minutes where her child was going to be taken away or she was going to be prosecuted for hiding people in her house. Okay. That was submitting to the authority of those officers. That wasn't granting consent. Was there anything that the officers told her that was not accurate? Say again? Was there anything that the officers told her that was not accurate? It was not, Your Honor. What was not accurate? Nothing that they told them was inaccurate, Your Honor. Okay. I have no argument. Okay. So the officers weren't telling her anything that wasn't true. If there were people in the home that were wanted by the police and she were to hide them and prevent the officers from getting there, she might have been in trouble and, as a result, she might lose her children and so forth. That's correct. And my last argument was, even if that consent was constitutionally sufficient, the fact that they were in the cartilage at the time, violating the Fourth Amendment, okay, in no way would allow that to be a valid consent at that point. Thank you. All right. Mr. Lukoff? May it please the Court, good morning. My name is Aaron Lukoff. I represent the United States of America. I'd like to pick up with the first question that was posed to Mr. Marich, and that was the standard proof the officers had to have that somebody was in the house before they could go in, whether it was the issue, did the officers have to know, or did they have to have probable cause? I believe the standard is the officers had to have probable cause in order to enter that residence, not that they had to know. And I believe that's... You're talking about for purpose of executing the arrest warrant. Serving the arrest warrant, yes. In this case, the officers didn't believe that they had probable cause to enter the house. They chose a less intrusive means of investigating whether these individuals were at the house or not, and they chose to try to gain consent from the residents of the house. I'd also point out that even though one of the officers in the case characterized this as a knock-and-talk, this case really isn't the typical knock-and-talk that courts are often confronted with. These officers were not at the house to fish for evidence or evidence of illegal activity or contraband. They were at the house for one specific purpose, and that was to determine if three fugitives were currently inside the residence. I would disagree with Mr. Maris on the point that curtilage is the more important issue in this case. We believe that the ultimate issue in this case boils down to whether Rosentina Gonzalez gave voluntary consent, and there's no better evidence that she provided voluntary consent than her testimony at the suppression hearing. When she was asked by Mr. Maris, did they ask you if they could come in, referring to the officers, she said yes. He then asked her, what was your response, and she said, I said sure. He then asked her right away, and she said, uh-huh, yes. So based on her testimony alone, there's no evidence that her consent was involuntarily given, coerced, or threatened. If the panel has, unless the panel has any further questions for me, I'll rest on my brief on this matter. Thank you, counsel. Thank you. Mr. Maris, I think you have about 39 seconds if there's something. Your Honor, let me, if I might, give you 39 seconds of the fact that the officers, when they approached the door and they testified at our suppression hearing, testified that they spent five minutes discussing the situation with Ms. Gonzalez. She never, however, never denied them immediately entry into the thing. However, there was five-minute conversation going on there. And her testimony at the suppression hearing, of course, sometimes we can't control our witnesses, as you know very well, and this was one of the cases where this young lady was scared to death, both that night and the night that we were at the suppression hearing. Thank you, counsel. All right. Next, the lance will be submitted. The following case, United States v. Week, has been submitted on the briefs. We will proceed to Marikis v. Boeing.
judges: Browning, Tashima, Bybee